# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| vs. | : | Docket No.: 25-cr-00257 |
| MICHAEL HOCHMAN | : | |

## MICHAEL HOCHMAN'S SENTENCING MEMORANDUM[1]

Mr. Hochman, by and through undersigned counsel, submits this Sentencing Memorandum to assist the Court in dispatching its constitutional and statutory obligation to impose a sentence sufficient, but not greater than necessary, to meet the goals of sentencing.

Mr. Hochman accepts full responsibility and is extremely remorseful for his criminal actions. Nothing in the following memorandum is intended to excuse or assign blame for Mr. Hochman's actions. Rather, the following is only presented to give a fuller picture of who Mr. Hochman is beyond his criminal acts and to assist the Court in reaching its decision.

## I.     INTRODUCTION

The Court, when attempting to determine the appropriate sentence for anyone convicted of a Federal crime "*shall*" impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in § 3553(a).[2] Undersigned counsel, on behalf of Mr. Hochman, seeks

---

[1] Mr. Hochman fully and completely stands behind the negotiations in his plea agreement. It is his hope that the Court will honor the plea agreement and sentence Mr. Hochman to one hundred and eighty (180) months. Mr. Hochman makes his arguments and requests only to frame the guidelines in such fashion as to prove to the Court that the negotiations are sufficient to protect the community, punish Mr. Hochman, promote respect for the law, and the other dictates of 3553.

[2] Section 3553(a) provides in part that the court shall impose a sentence sufficient, but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from

only a sentence that will provide the same.

In this case, we ask nothing more than that this Court, pursuant to the parsimony provision, sentence Mr. Hochman to one hundred and eighty (180) months.

## II.    FACTUAL BACKGROUND

As Mr. Hochman has accepted responsibility and pled guilty, the allegations set forth during his plea hearing are adopted and incorporated herein.

## III.    ANALYSIS

Pursuant to statutory mandate, when sentencing a defendant, district courts must impose a sentence that is "sufficient" but not greater than necessary to comply with purposes of sentencing. *United States v. Olhovsky*, 562 F.3d 530, 547-548 (3d Cir. 2009) (quoting 18 U.S.C. §3553 (2006)); *but see United States v. Dragon*, 471 F.3d 501, 506 (3d Cir. 2006) (holding that parsimony provision does not require district judges to routinely state that imposed sentence is necessary to achieve purposes enumerated in § 3553(a)). To comply with this mandate, the Third Circuit Court of Appeals directs District Courts to first consider the advisory sentencing guidelines, specifically stating:

> "[T]he guidelines should be the starting point and the initial benchmark in determining the appropriate sentence." *Gall v. United States*, ___ U.S. ___, 128 S.Ct. 586, 596, 169 L.Ed.2d 445 (2007); *see also, United States v. Golf*, 501 F.3d 250-257 (3d Cir. 2007) ("because the guidelines reflect the collective wisdom of the various institutions, they deserve careful consideration in each case . . . . [T]hey cannot be ignored.") Prior to, but consistent with *Gall*, this Court set forth a three part process for determining a sentence. Under *United States v. Gunther*, district courts must begin with a correct calculation and reason from that starting point to the appropriate sentence based on the facts of the individual case and the exercise of the district court's discretion pursuant to 18 U.S.C. §3553. *United States v. Gunther*, 462 F.3d 237, 247 (3d Cir. 2006);

---

further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

> *see also, United States v. Jackson*, 467 F.3d 834, 838, n.4 (3d Cir. 2006) ("we require that the entirety of the guidelines calculation be done correctly"). Therefore, in accordance with the dictate of the Supreme Court and this Court, a district court errs when it fails to calculate the guideline range correctly or begins from an improper guideline range in determining an appropriate sentence.

*United States v. Smalley*, 517 F.3d 208, 211 (3d Cir. 2008). Even though the Court is required to properly calculate and consider the sentencing guidelines, they are only one of a number of factors to be considered in dispatch of this Court's obligation to impose a sentence minimally sufficient, but not greater than necessary to meet the goals of sentencing. In fact, the Supreme Court has stated that district courts may not consider the guidelines as presumptively reasonable. *Nelson v. United States,* 555 U.S. 350, 352 (2009) (*per curiam*) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable."); *see also id.* ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.").

In *Gunther*, the Third Circuit first articulated the three-step approach to sentencing referenced in the above-quoted language from *Smalley.* Specifically, the Third Circuit stated:

> Our post-*Booker* precedent instructs district courts to follow a three-step sentencing process.
> * * *
> 1. Courts must continue to calculate a defendant's sentencing guidelines precisely as they would have before *Booker*;
>
> 2. In doing so, they must formally rule on motions of both parties and state on the record whether they are granting a departure and how the departure affects the guideline calculation and take into account our circuit's pre-*Booker* case law which continues to have advisory force; and
>
> 3. Finally, they are required to "exercise" their discretion by considering relevant §3553(a) factors in the sentence they impose regardless of whether it varies from the sentence calculated under the guidelines.

*Id.* at 247. The Court of Appeals has repeatedly restated the applicability of this three-step process. *See, e.g., United States v. Olhovsky*, 562 F.3d 530, 546 (3d Cir. 2009).   In exercising its discretion, this Court is free to consider any and all factors that may be relevant to its sentencing decision. *See Irizarry v. United States*, 553 U.S. 708, 714-15 (2008) ("Although the Guidelines, as the "starting point and the initial benchmark," continue to play a role in the sentencing determination, *see Gall*, 552 U.S., at 49, 128 S.Ct. 586, there is no longer a limit comparable to the one in *Burns* on variances from Guidelines ranges that a district court may find justified under the sentencing factors set forth in 18 U.S.C. § 3553(a) (2000 ed. and Supp. V).").

In making the individual assessment of the facts and circumstances of Mr. Hochman's case, there is no limitation upon the information concerning Mr. Hochman's background, character, and conduct which this Court may receive and consider for the purpose of imposing an appropriate sentence.  18 U.S.C. § 3661 (2006); *see also Pepper v. United States*, 562 U.S. 476 (2011) (same).

Finally, the Court of Appeals has made it clear – as recently as the first week of May 2024 – that District Courts must engage in independent review of the 3553(a) factors by "disclos[ing] meaningful consideration of the relevant statutory factors and the exercise of independent judgment, based on a weighing of the relevant factors, in arriving at a final sentence.'" *United States v. Kluger*, 722 F.3d 549, 566 (3d Cir. 2013) (quoting *United States v. Grier*, 475 F.3d 556, 571–72 (3d Cir. 2007) (en banc)). In other words, step three requires "a true, considered exercise of discretion." *United States v. Friedman*, 658 F.3d 342, 359 (3d Cir. 2011) (quoting *United States v. Jackson*, 467 F.3d 834, 841 (3d Cir. 2006)). An exercise of discretion tainted by an erroneous legal conclusion—including a misinterpretation of the Guidelines—results in procedural error requiring resentencing unless the error is harmless. *See United States v. Wise*, 515 F.3d 207, 217

(3d Cir. 2008); *United States v. Zabielski*, 711 F.3d 381, 386 (3d Cir. 2013); *see U.S. v. Cora Alicea*, 23-1197 (3rd Cir. May 6th, 2024).

## IV.    OBJECTIONS

1)  Mr. Hochman has no guideline objections to the final presentence report.

## V.    REASONS FOR VARIANCE

### (A)    One hundred and eighty (180) months is sufficient to satisfy § 3553

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States,* 518 U.S. 81, 113 (1996). At least as early as 1949, the United States Supreme Court has said that "the punishment should fit the offender and not merely the crime." *Williams v. New York,* 337 U.S. 241,247 (1949); see also *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U. S. 51, 55 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender").

First, the character letters in support of Mr. Hochman indicate he is extremely well regarded by his family and community.  As evidenced by the nine (9) character letters submitted along with this memorandum, those who know Mr. Hochman value him as a son, friend, and community member.[3]  In further reviewing these letters, it becomes abundantly clear that Mr. Hochman is an extremely generous, capable, and caring person.

---

[3] *See* Exhibit D-1 which includes nine (9) character letters submitted for the within memorandum.

In a letter from Ellen Hochman, Mr. Hochman's mother, she shares how Mr. Hochman has owned up to his actions and has been working hard towards improving himself. Mrs. Hochman shares how much she values her relationship with her son and applauds him for having attended therapy and being active with charity work. In looking beyond his inner demons, Mrs. Hochman writes "[h]e has a good heart, it just took a long time for him to recognize what he is capable of and to whom he wants to share it with."

In a letter from a close friend of over twenty (20) years, Lesley Dotson details how Mr. Hochman was there for her when she lost her mother suddenly. Ms. Dotson shares that Mr. Hochman was always someone who would offer support and encouragement for her when she needed it most.  In reading these letters from those close to Mr. Hochman, it becomes apparent that while Mr. Hochman has made a terrible decision, Mr. Hochman is a man of high character who truly enjoys spending his time helping others and sought nothing in return.

In sum, Mr. Hochman prays that the Court will consider his background and community support when fashioning a sentence that is sufficient, but not greater than necessary to satisfy the goals of § 3553(a).

### (i)  Mr. Hochman's community service and non-profit employment

Mr. Hochman additionally has a number of letters from non-profit and community service organizations he has worked with. In letters from The Millbrook Society, Visit Philadelphia, and the National Giving Alliance, members of leadership detail Mr. Hochman's integrity, selflessness, and kindness.[4] For example, in a letter from Lisa Tordo, the Executive Director of the National Giving Alliance, Ms. Tordo writes "[w]hat sets Michael apart is his unwavering dedication to his work and community. He consistently goes above and beyond, not for recognition, but out of a

---

[4] *See* Exhibit D-1.

deep sense of responsibility and purpose. I have seen first-hand his enthusiasm for NGA and for the Millbrook Society he is a member of, which is infectious, and motivates others to rise to their own potential. His team-first mindset fosters collaboration, unity, and respect." Irrespective of the fact that Mr. Hochman's involvement with these organizations both predates and postdates the investigation of the underlying matter, we respectfully submit that Mr. Hochman has exemplified a great deal of responsibility and desire to change and by choosing to volunteer extensively for these organizations. We ask that the Court recognize that Mr. Hochman hasn't simply paid lip service to his desire to make up for what he did.

While we understand that it will ultimately be up to the Court to decide the level of Mr. Hochman's receptivity for rehabilitation and risk of recidivism, we respectfully submit that Mr. Hochman's extensive community service should be given significant weight.

### (B)    The Joint Recommended Sentence is far above the Top of the Guideline Sentencing Range

While Mr. Hochman fully understands that the mandatory minimum and likewise the joint recommended sentence for the instant offense is one-hundred and eighty (180) months, he respectfully submits that the current applied guideline range should be adjusted.

### i) The 2021 Sentencing Commission's Report to Congress

In June of 2021, the Sentencing Commission released a report to Congress on the child pornography guidelines for non-production offenders. *See Federal Sentencing of Child Pornography: Non-Production Offenses* June 2021 ["Child Porn Report"].[5] The report updated and expanded upon the 2012 report wherein the Commission explained that it compiled the 2012

---

[5] The report can be found at:  https://www.ussc.gov/research/research-reports/federal-sentencing-child-pornography-non-production-offenses

report in large part due to the increasing rate of below-guideline sentences for offenders sentenced under USSG § 2G2.2, pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback from judges as reflected in their sentencing decisions," *id.* at ii, and because "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability." *Id.* at ii, 323.

In the Child Porn Report 2021, the Commission explained that the Key Finding 1 was

> [f]acilitated by advancements in digital and mobile technology, non-production child pornography offenses increasingly involve voluminous quantities of videos and images that are graphic in nature, often involving the youngest victims. In fiscal year 2019, non-production child pornography offenses involved a median number of 4,265 images, with some offenders possessing and distributing millions of images and videos.  Over half (52.2%) of non-production child pornography offenses in fiscal year 2019 included images or videos of infants or toddlers, and nearly every offense (99.4%) included prepubescent victims.

> *Child Porn Report* at 4.

In Keynote 2, the Commission found that

> [c]onstrained by statutory mandatory minimum penalties, congressional directives, and direct guideline amendments by Congress in the PROTECT Act of 2003, §2G2.2 contains a series of enhancements that have not kept pace with technological advancements.  Four of the six enhancements — accounting for a combined 13 offense levels — cover conduct that has become so ubiquitous that they now apply in the vast majority of cases sentenced under §2G2.2. For example, in fiscal year 2019, over 95 percent of non-production child pornography offenders received enhancements for use of a computer and for the age of the victim (images depicting victims under the age of 12). The enhancements for images depicting sadistic or masochistic conduct or abuse of an infant or toddler (84.0% of cases) or having 600 or more images (77.2% of cases) were also applied in most cases."

> *Id.*

In Keynote 3, the Commission found

> "[b]ecause enhancements that initially were intended to target more serious and more culpable offenders apply in most cases, the average guideline minimum and average sentence imposed for nonproduction child pornography offenses have increased since 2005. The average guideline minimum for non-production child pornography offenders increased from 98 months in fiscal year 2005 to 136 months in fiscal year 2019. The average sentence increased more gradually, from 91 months in fiscal year 2005 to 103 months in fiscal year 2019.

> *Id.* at 5.

In Keynote Four, the Commission found

> [a]lthough sentences imposed remain lengthy, courts increasingly apply downward variances in response to the high guideline ranges that apply to the typical non-production child pornography offender. In fiscal year 2019, less than one-third (30.0%) of non-production child pornography offenders received a sentence within the guideline range. The majority (59.0%) of nonproduction child pornography offenders received a variance below the guideline range. Non-government sponsored below range variances accounted for 42.2 percent of sentences imposed, and government sponsored below range variances accounted for 16.8 percent.

> *Id.*

Mr. Hochman received 2 levels for prepubescent minor, 2 levels for use of a computer, and 5 levels for the number of images (1900). As the Commission found, over ninety-five (95) percent of child porn defendants received enhancements for such conduct, Mr. Hochman respectfully submits that the enhancement should not be applied to his case. It is axiomatic that cellphones and computers rule our world.[6] Long gone are the days of "porno mags". If every criminal defendant is using a computer/cell phone for viewing of child pornography, such conduct should not rightly be a factor that enhances a sentence. Furthermore, as the Commission found that the median

---

[6] The Chamber of Commerce reported in July of 2024 that a whopping 71.7% (183 million) Americans rely solely on mobile phones. https://www.chamberofcommerce.org/landline-phone-statistics.

number of images possessed is 4265, not only are the Guidelines punishment for extra levels not keeping up with technology, but Mr. Hochman's collection of child porn is below the average defendant. For both reasons, the application of five (5) additional levels for the number of images he possessed is unfair, unjust, and inappropriate.

Mr. Hochman respectfully submits that, if the Court subtracts the nine (9) levels for enhancements for use of a computer, having prepubescent images, and the number of images possessed, Mr. Hochman's offense level would be a 25 making his guideline range, 57-71. Mr. Hochman therefore respectfully submits that a sentence of one hundred and eighty (180) months is more than sufficient to satisfy the dictates of §3553.

**(C)** __The shame, embarrassment and collateral consequences of his criminal act.__

Prior to his criminal actions, Mr. Hochman was well-respected in his community and among his peers. Tragically, his poor decision to violate the law caused his life to career out of control. In today's internet age, Mr. Hochman will never be able to escape his actions. He will wear this conviction like a scarlet letter for the rest of his days. *See United States v. Smith*, 683 F.2d 1236, 1240 (9th Cir. 1982) ("The stigma of a felony conviction is permanent and pervasive.").

The embarrassment he has caused his family and the shame now attached to his name in the community has taught him a harsh lesson that will forever be tattooed on his conscience. As long as he lives, nothing will ever erase what he has done to his reputation and more importantly, to his family. We however ask the Court to recognize that the intangible punishment Mr. Hochman has received – the shame of his family; the dishonor to his name; diminished prospect of upward career mobility; the destruction of his reputation – are all punishments that, while not meted out by the Court, are very real and extremely relevant. As recognized by the Courts and former

Presidents, the stigma of the intangibles that come with his conviction for a man like Mr. Hochman is a punishment that Courts should consider when determining what sentence is appropriate.

Mr. Hochman will not re-offend. While it is true that true repentance is being in the same situation and making a different choice, if given that opportunity Mr. Hochman would not choose the same path. As such, Mr. Hochman prays that the Court will consider the intangible effects of his conviction when fashioning a non-custodial sentence that is sufficient, but not greater than necessary to satisfy the goals of § 3553(a).

**(D)**     **Mr. Hochman immediately sought to take responsibility and entered a pre-indictment plea**

During the period of time in which Mr. Hochman learned he was under investigation, Mr. Hochman retained the undersigned and contacted the United States Attorney's Office seeking plea negotiations to accept responsibility for his conduct. Ultimately, Mr. Hochman waived his right to a grand jury indictment and entered into a pre-indictment guilty plea. Not only did Mr. Hochman take responsibility swiftly, his pre-indictment plea also allowed the government and the Court to preserve time, resources, and judicial economy.

In sum, it is wholly within this Court's discretion to determine the level of commendation and value of Mr. Hochman's pre-indictment plea. Mr. Hochman prays this Court will weigh such expediency in favor of an acceptance of the joint recommended sentence in this matter.

**(E)**     **Recommendation to the Bureau of Prisons**

Mr. Hochman is aware that the Court may not dictate to the Bureau of Prison how nor where to house him. However, based upon Mr. Hochman's medical conditions, he will ask that the Court recommend that he be housed at an institution that can provide for his medical needs.

**(F)**    <u>**Restitution**</u>

The Government and Mr. Hochman are still working on the restitution issue. Mr. Hochman respectfully reserves the right to challenge and address this issue if an agreement is not reached.

**VI.**    <u>**CONCLUSION**</u>

Based on the above arguments and the law cited, we respectfully request that this Court impose the negotiated sentence in this matter.

       **Respectfully submitted,**

       */s/ Michael J. Diamondstein*
       **MICHAEL J. DIAMONDSTEIN**
       **Attorney for Michael Hochman**
       Suite 900
       Two Penn Center
       1500 John F. Kennedy Boulevard
       Philadelphia, Pennsylvania 19102
       (215) 940-2700

## <u>CERTIFICATE OF SERVICE</u>

Michael J. Diamondstein, Esquire being duly sworn according to law, deposes and says that on the **10th** day of **October, 2025** a copy of the within document was served upon the following individuals via email:

**The Honorable Kelly Brisbon Hodge**
**U.S. District Judge**
Eastern District of Pennsylvania
James A. Byrne U.S. Courthouse
601 Market Street
Philadelphia, PA 19106
**Via ECF**

**Clerk's Office**
Eastern District of Pennsylvania
James A. Byrne U.S. Courthouse
601 Market Street
Philadelphia, PA 19106
**Via ECF**

**Michelle Rotella, Esq.**
**Assistant United States Attorney**
Eastern District of Pennsylvania
615 Chestnut Street
Philadelphia, PA 19106
**Via Email**

**Talia Santella, USPO**
United States Probation
Philadelphia, PA
**Via Email**

*/s/ Michael J. Diamondstein*
**MICHAEL J. DIAMONDSTEIN**
**Attorney for Michael Hochman**

# Exhibit D-1



# The Millbrook Society
*Forward into the Past*

PO Box 506, Hatboro, PA 19040

www.millbrooksociety.org

4/29/25

To Whom it May Concern:

Michael Hochman joined the Millbrook Society in 2023 looking for an opportunity to utilize his skills in journalism and marketing for a volunteer organization. He eagerly jumped into helping with multiple major projects, including maintaining our website and helping to organize the Crooked Billet History Fair.

He was soon elected to the Board of Directors and currently serves as Co-Director of Communications and Membership. He serves on both the Events and Museum Committees. After joining the Board, he took on additional responsibilities including the organizing our yearly membership drive and other communications projects. Michael also has taken it upon himself to have the Amy B. Yerkes Museum of Hatboro History open during all events held at the Pennypack Community Center to increase awareness of both the Museum and the Society and he has done it to tremendous success.

His work this year for the 3rd Annual Crooked Billet History Fair was invaluable. He stepped up to seek out sponsors and bought in over double our budget. The website was consistently update to reflect new sponsors and exhibitors as they signed up. When other team members were having rough days, not only did Michael step up to help with their tasks without a single thought, but he sent words of encouragement to lift them up.

Michael's attitude towards Millbrook's projects and other projects he has told us about, shows his commitment to whatever he does. He is a team player, offers ideas, solutions and compromises, steps up when needed and encourages others in their roles. Michael has brought many new ideas and skills to Millbrook that we were lacking and has become an asset to us. We are all grateful for his time, energy, ideas and commitment.

Sincerely,

Christina Lessard-McDuell

Christina Lessard-McDuell

Co-Director of Communications and Membership
Director of Events
Director of Archaeology

The Millbrook Society
PO Box 506, Hatboro, PA 19040
millbrooksociety@gmail.com

**VISIT
PHILADELPHIA**®

April 29, 2025

To Whom It May Concern:

Michael Hochman has been an indispensable freelance writer for visitphilly.com for several years now.

Visit Philadelphia's popular website is a trusted resource for more than 7 million users each year. It's populated with up to 10 articles about what to see and do in Philly every single week. We could not do what we do in terms of quantity or quality without Michael's commitment and enthusiasm for our work.

This prolific freelancer cranks out multiple high-quality articles for us each week. He does so with great attention to detail, intense curiosity for the subject matter and immense pride.

For these reasons and many others, I highly recommend Michael. The Visit Philadelphia content team is better and stronger because of him, and for that, I am extraordinarily grateful.

Best,
Cathy McVey
Senior Vice President, Strategic Integration



# THE  MILLBROOK  SOCIETY

P.O. Box 506     Hatboro, Pennsylvania 19040

Hatboro, Pa.

April 29, 2025

To Whom It May Concern:

This letter is to commend Michael Hochman to you. Mr. Hochman came to the Millbrook Society as a volunteer in 2023 and immediately became immersed in the society's varied projects and activities. His value to Millbrook was quickly recognized, and he was invited to join the board of directors. His enthusiasm and easy manner have proven contagious.

Always attentive to others, he is sensitive and unassuming. Michael listens and ascertains where his talents and experience can best serve Millbrook, then works with other members to achieve positive results in various projects and programming. He took the lead with the society's web page. That showcases the attributes of what, when, and how Millbrook serves the public. He also works with the committee that oversees and operates the Amy B. Yerkes Museum. Michael is a coleader of Millbrook's Crooked Billet History Fair. That has become a very popular gathering of local historical organizations sharing with the public the value of preserving and teaching our common history, sharing ideas, and programming. At a time when volunteerism and membership in historic societies are suffering, Michael has proven that with the right programs and style, we will continue "Forward into the Past."

With regard

D.T. Shannon/Executive Director



NATIONAL TRUST
MEMBER
ORGANIZATION

**VISIT
PHILADELPHIA**®

To whom it may concern:

I've had the pleasure of working closely with Michael Hochman for more than three years, during which he's become a valued contributor to visitphilly.com, crafting more 100 engaging and informative articles for our website, which saw more than 10 million visits in 2024. Whether he's writing about the latest craft beer hotspots, family-friendly adventures or monthly event roundups, Michael consistently delivers thoroughly researched, compelling pieces that resonate with our readers. His attention to detail and commitment to accuracy have made him a trusted voice within our content team.

Beyond his exceptional writing skills, Michael stands out for his excellent communication and proactive approach. He ensures clarity throughout each project, asking insightful questions and providing timely updates, which helps streamline our workflow and maintain high-quality standards. His dependability and enthusiasm have made our collaboration both smooth and enjoyable. We look forward to continuing our partnership and highly recommend Michael.

Respectfully yours,

Daniel Wisniewski
Senior Director, Digital Content & Strategy

05/01/25

To whom it may go concern:

About Michael Hochman, what has changed, and who he has become in the last couple of years.

Therapy has played an integral role in looking at life. First and foremost, he has owned up to the acts of his past. Second, he has established himself as a productive man, doing all the right things in a positive direction.

His charity work and what he writes about it in pamphlets and newsletters has been an inspiration to many in our community. This has made him a productive part of the volunteering aspect and the change that has occurred during these couple of years.

Honesty and love of family is what I see now. My son no longer is hiding behind some facade, afraid to show himself. From the son I've always dreamed about having, to the wonderful son I have now, all, to be swept away from me. I might live in a senior facility, but that doesn't come close to giving me love and support that a hug and a kiss from Michael each time we are together. His calling and texting me each day boosts my moral and jump starts my day. We share so many thoughts and deals now all the events he attends and my day to

day life. Our lives have now been intertwined, with one another, that's so beautiful to experience. He has a good heart, it just took a long time for him to realize what he is capable of and to whom he wants to share it with.

Now, just a little bit of what he does for my personal needs. He is my eyes, my eyesight is failing due to Macular Degeneration in both eyes. A recent bout with ~~SKIN CANCER~~ he has been so supportive in every way, especially my anxiety. Also taking me to Bucks County Blind Association facility for extensive evaluations and implementing their plan for me. He is there for many, many things, helping me deal with the stress of all that is happening to me. The list is very long of how much I rely on him. We have either lunch or dinner together once a week while watching sports or news or a good movie. It's a time to share what's happening in our lives in person. We are a team now, feeding off one another, making each of us feel a mother and a son should care about each other. A blessing in disguise has finally emerged, only to be taken away. No more hugs and kisses that were

absent for so long. It took years to come to this overdue relationship, now being snuffed out. I probably won't be around to feel that warmth and experience it again. So frightening and so sad!

This man, my child, my son, has given me hope that life is worth living at age eighty-five! Please let me have that for a while longer.

Ellen Hochman, Mother

Letter

From:   lgarr2079@aol.com (lgarr2079@aol.com)

To:     mphochman@aim.com

Date:   Sunday, May 4, 2025 at 06:20 PM EDT


To whom it may concern,

Hello, my name is Lesley Dotson. I'm writing this letter on behalf of Michael Hochman. Obviously, the only reason why you're reading this letter, and I'm even writing it in the first place, is because some very poor choices were made by Michael. But, because you've only been acquainted with that small piece of him, I'd like to share with you the Michael that I know.

I've known Michael for over 20 years. We met in 2001 when he was living in my hometown of Wichita, Kansas. Michael is one of my very best friends. Through the years of our friendship, he's been the one I go to on my very best days, and also on my very worst.
He's been my support through the loss of my marriage & my chronic health issues...always there to offer support & encouragement. But, more importantly, to listen & remind me that someone cares. Five years ago, when my mother experienced a sudden brain bleed, it was Michael that I contacted from the ER. He was the one I leaned on during my mom's passing & these following years of immense grief.
If I have a question about something or need advice, I call on Michael. I know that no matter what I'm needing help with, he'll never act like I'm silly or dumb...even if he has to send 30 minutes worth of step-by-step screenshot instructions of how to fix something I'm stumped by.
When you have a friend that does the little things, like adding money onto your Starbucks card for your birthday...as well as big things, like filling in the gap when the majority of your loved ones die (as mine have in the past ten years), that person becomes family.
I'm absolutely heartbroken over this entire situation. I hope and pray for leniency in any area possible.
Thank you for taking the time to read this letter.

Sincerely,
Lesley (Garrison) Dotson
Wichita, Kansas
316-619-8300



April 30, 2025

**National Board of Directors**

President
Chris Rosenbaum

Vice President
Tiffany Olford

Treasurer
Greg Smith

Secretary
Parul Bhatia

Members
Pauline Bao
Navaid Baqai
Emmanuel Durham
Ariane Datil
Leigh Leonard
Shayna Moliver
Tiffany Olford
Justin Poggioli
Marcia Ransom

Executive Director
Lisa Tordo

To Whom It May Concern:

It is with great enthusiasm that I write in support of Michael Hochman. In every capacity I have seen him serve, the National Giving Alliance with an exceptional combination of work ethic, integrity, and leadership.

Michael contacted the National Giving Alliance after researching the organization. He was drawn to its mission and history. He offered his professional skills as a journalist to help highlight and promote NGA's illustrious history and its mission of serving the most vulnerable in our society: homeless and low-income children, youth and their families.

What sets Michael apart is his unwavering dedication to his work and community. He consistently goes above and beyond, not for recognition, but out of a deep sense of responsibility and purpose. I have seen first-hand his enthusiasm for NGA and for the Millbrook Society he is a member of, which is infectious, and motivates others to rise to their own potential. His team-first mindset fosters collaboration, unity, and respect.

Michael leads not through position but through example, demonstrating initiative when needed and offering steadfast support to others. His ability to take initiative and professionalism is evident in the work he has done for NGA and for initiating the Annual History Fair in our community.

In every responsibility he undertakes, Michael approaches the work with focus, humility, and a clear sense of purpose. His ability to bring people together is evident in the final product of his efforts.

Sincerely,
National Giving Alliance

Lisa Tordo
Executive Director



**The Millbrook Society**
32 North York Road | PO Box 506
Hatboro, PA 19040 | 215-957-1877
millbrooksociety@gmail.com

To whom it may concern:

This brief note in my role as Executive Director is to verify that Michael Hochman has volunteered many, many hours for The Millbrook Society (Hatboro PA's all-volunteer historical society and educational organization) since he joined us in September of 2023.

This includes approximately 150 hours of attendance and participation in Board of Directors meetings and planning sessions, an estimated 80 or so hours of management and volunteer assistance at community events run by or attended by the organization, and likely around 100 (or more) additional hours of committee and independent work on events like our annual community history fair (which he helped organize), helping manage the Amy B. Yerkes Hatboro History Museum, and maintaining Millbrook's website, for a total of 330-350 hours or so of volunteer service to the organization.

Thank you,
D.T. Shannon
Executive Director, The Millbrook Society
Hatboro, PA

NGA - Letter

From:   Lisa Tordo (lisa@nga.gives)

To:     mphochman@aim.com

Date:   Monday, June 23, 2025 at 09:10 AM EDT


To whom it may concern:
I am happy to verify that Michael Hochman has assisted and volunteered with our organization multiple times since 2023. In that time, he has volunteered with the National Giving Alliance writing promotional materials and press release documents for the organization to help increase our online presence as well as facilitating us in exhibiting at the Hatboro History Fair which he runs. NGA appreciates all Michael does and hopes Michael will continue to offer his assistance to us in the future.

Sincerely,

Lisa Tordo
Executive Director
National Giving Alliance
822 Veterans Way
Warminster, PA 18974
215-682-9183
Lisa@NGA.Gives
New Clothes Equalize, Used Clothes Pauperize